IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JOSE L. FRANKLIN, | ) | |
| | ) | |
| Plaintiff, | ) | No. 17 C 8376 |
| | ) | |
| | ) | **Judge Marvin Aspen** |
| v. | ) | **Magistrate Judge Jeffrey Cole** |
| | ) | |
| HOWARD BROWN HEALTH CENTER, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**

The plaintiff has asked Judge Aspen to bar defendant from contesting that Lyndon Vanderzanden, David Sgarbossa, Kevin Keiser, and Gilberto Soberanis sent harassing and discriminatory emails to the Plaintiff at work between December 2014 and July 2015. In the alternative, the plaintiff has asked Judge Aspen to give a missing evidence instruction at trial regarding the "instant messages" Lyndon Vanderzanden, David Sgarbossa, Kevin Keiser, Gilberto Soberanis sent to plaintiff. [Dkt. #56]. Judge Aspen has sent the matter here for a Report and Recommendation. [Dkt. #58]. In briefing this matter[1], the defendant has had to concede that, at the very least, it bollixed its litigation hold – and it has done so to a staggering degree and at every turn. As the ensuing discussion demonstrates, there can be little question that sanctions are warranted, if for no other reason that such irresponsibility with regard to discovery cannot be countenanced. The only real question is, what sanction is appropriate?

**I.**

This dispute began with plaintiff's document request no. 14, which required defendant to

---

[1] The plaintiff was given until September 18, 2018 [Dkt. #68] to file a reply brief. That date has come and gone with nothing from the plaintiff.

produce "[a]ny and all emails *and text messages* exchanged between any of the following that mention or concern the Plaintiff in any way at any time September 1, 2014 and July 28, 2015: Gilberto Soberanis, Lyndon Vanderzanden, David Sgarbossa, and/or Kevin Keiser." [Dkt. #37, at Page 12/56](Emphasis supplied). The defendant referred plaintiff to a number of "emails" already produced. [Dkt. #37, at Page 19/56]. As it turned out, plaintiff was looking for "instant messages," as this was purportedly the method the individuals used to harass the plaintiff. [Dkt. #37, at 2]. In all, defendant produced only two such messages; plaintiff felt there were many more, as deposition testimony indicated that was the standard way employees communicated with one another. [Dkt. #37, at 2].

The parties then went back and forth on whether "instant messages" had been saved, with the defendant writing to plaintiff, insisting that "instant messages" would only have been saved if one of the participants chose to save the message as a conversation at the time. [Dkt. #37, at 55-56/56]. Plaintiff pointed to deposition testimony from Mr. Sgarbossa in which he said he saved "instant messages" to his Outlook email folder. [Dkt. #37, at Page 3/56]. Plaintiff felt it was highly likely that there were "instant messages" about her in that file responsive to document request no. 14. [Dkt. #37, at Page 3/56].

Defendant's initial position was that "emails and text messages" are not "instant messages," and that plaintiff didn't ask for what she now claims she wanted. Beyond that, defendant assured the court that all responsive documents – including saved "instant messages" – had been produced. [Dkt. #45, at 8-9]. If, as Mr. Sgarbossa testified, there were saved "instant messages" in his folder, he gave them to counsel, and they did not concern plaintiff for the pertinent time frame, as the document request required. [Dkt. #45, at 8-9]. Mr. Sgarbossa testified that he did not recall any

2

saved messages that concerned the plaintiff. [Dkt. #45, at 3-4]. What defendant kept from plaintiff and the court was the fact that it had wiped the hard drive on Mr. Sgarbossa's computer years earlier. So, if there had been messages responsive to plaintiff's request, they were long gone.

Plaintiff wasn't buying defendant's story. On August 9, 2018, I ordered the parties to have a proper Local Rule 37.2 conference about the dispute, as it was apparent that they had not met and conferred in good faith as the Rule requires. [Dkt. # 46]. *See Stingley v. City of Chicago,* 2009 WL 3681984, 2 (N.D.Ill. 2009)(and cases cited).

During the conference, defendant tendered an affidavit from its IT manager, Jake Givens, who said that "in 2015 when [plaintiff] threatened litigation," the defendant instituted a litigation hold that covered all emails *and* instant messages relevant to plaintiff from then-current employees. However, the claim was that no in-house or outside attorney or anyone in charge oversaw this; instead, the defendant allowed employees to decide on their own what was relevant and what wasn't. [Dkt. #56, Page 90-91/177]. Mr. Givens didn't give a specific date for the litigation hold – of course, that omission was the choice of defendant's attorneys involved in drafting his affidavit – but we know from a memo from plaintiff's supervisor, Mary Brewster, that plaintiff specifically promised a lawsuit based on "racism, transphobia and sexism" among the staff as early as July 24, 2015. [HBHC000138]. The defendant's attorney incorrectly calls this a "vague threat." [Dkt. #72, at 5].[2]

One of plaintiff's alleged harassers was Mr. Soberanis. His employment with defendant ended on July 26, 2015, a mere two days after a promised lawsuit by the plaintiff. In a more recent affidavit from defendant's IT department, IT services manager, Robert Gable (it seems that everyone

---

[2] The Sedona Conference has recommended that a "'reasonable anticipation of litigation arises when an organization is on notice of a credible probability that it will become involved in litigation....'" *Spanish Peaks Lodge, LLC v. Keybank Nat. Ass'n*, 2012 WL 895465, at *1 (W.D. Pa. 2012).

in defendant's IT department is a "manager"), tells us that Mr. Soberanis's computer was wiped within just 7 days of his last day at work. Mr. Gable mentions nothing about any litigation hold. [Dkt. #72-3]. Defendant's counsel tells us that that was okay because, at that point, plaintiff had not made any *specific* allegations against Mr. Soberanis. [Dkt. #72, at 12]. The allegation must be considered in light of the fact that defense counsel reads Ms. Brewster's memo reporting that plaintiff told her that defendant could "expect" a lawsuit charging "racism, transpohobia, and sexism" as "vague."

Conversely, defendant apparently was aware of what it what it denominates as "vague threats" of litigation before the memo from Ms. Brewster – apparently, for "weeks" before. Defendant's general counsel, Michelle Wetzel, tells us in her affidavit that because of "the circumstances of the final *weeks* of [plaintiff's] employment", she instructed Eileen Kelly of the IT department (she's described as "System Administrator of IT") to remove plaintiff's computer from the regular wiping process in the event it was needed for evidence in the future. [Dkt. #72-1, ¶ 4]. Ms. Wetzel says that Ms. Kelly followed her instructions [Dkt. #72-1, ¶ 2], but there is no indication how she knows that because she does not say she oversaw the process or ever looked at the computer. There is no indication from Ms. Wetzel that she ever took control of the computer and other materials or what exactly took place once the computer was to be removed from the regular wiping process. More on that later; but Ms. Wetzel does tell us that Ms. Kelly left defendant's employ in April 2017, a few months before plaintiff filed suit, and now, she too, is suing the defendant. [Dkt. # 72-1, Par. 2].

Assuming– contrary to reason, logic and basic good sense, which always play a significant

4

role in litigation[3] – a professional like Ms. Wetzel had been content to leave plaintiff's computer in the hands of an employee for two years, as her affidavit claims, it is astounding and frankly unbelievable that, once Ms. Kelly left, neither Ms. Wetzel nor anyone else checked up on the computer. And, based on what defendant has presented in its response to plaintiff's sanctions motion, nothing was done to retrieve the computer or any information from Ms. Kelly if, indeed, she has it. Of course, the failure to mention any other steps that defendant took allows a finding that nothing beyond what defendant's affidavits tell us was done was done. *See BankDirect Capital Fin., LLC v. Capital Premium Fin., Inc.*, 2018 WL 1616725, at *7 (N.D. Ill. Apr. 4, 2018)(collecting authorities).

According to Ms. Wetzel, and contrary to the affidavit of Mr. Givens, the litigation hold was not instituted when plaintiff threatened litigation; it was not until August 28, 2015 – slightly more than a month after the supposedly "vague" threat – four days after defendant received a demand letter from plaintiff's then-attorney charging discrimination that it was supposedly done. Ms. Wetzel circulated the demand letter among all Health Center employees and instructed them to "preserve" all documents, including electronically stored information, including "all communications between [plaintiff] and [defendant] and its employees" and "all communications between any third party and [defendant] and any of its employees concerning [plaintiff]." [Dkt. #72-1, Page 11/16]. There is no indication what employees were to do with documents or electronic files and information that had

---

[3] Judges need not leave experience and common sense at the courthouse door. *United States v. Blagojevich*, 614 F.3d 287, 290 (7th Cir.2010). *See District of Columbia v. Greater Washington Bd. of Trade*, 506 U.S. 125, 135 n.3,(1992). Quite the contrary; they should apply such reasonable inferences as are justified "in light of their experience as to the natural inclinations of human beings." *United States v. Starks*, 309 F.3d 1017, 1023 (7th Cir.2002). *See* also,, *Batson v. Kentucky,* 476 U.S. 79, 121 (1986); *United States v. Montoya De Hernandez*, 473 U.S. 531, 542 (1985); *Withrow v. Larkin,* 421 U.S. 35, 47 (1975).

5

to be preserved, or how they should be preserved, and there was no indication that they should forward or deliver the information, files, etc., to defendant's legal department. To put it charitably, that's a pretty "vague" (and ineffectual) litigation hold.

So, defendant didn't effect a litigation hold until over a month after Ms. Brewster's memo about plaintiff's promise of litigation, and perhaps two or more months after it should have known litigation was at least a distinct a possibility, especially given Ms. Wetzel's concerns about the final *weeks* of plaintiff's employment. Those concerns were enough for Ms. Wetzel to direct that plaintiff's computer be retained and her information preserved. For whatever reason, those concerns weren't enough to do anything else until a month later. That meant that Mr. Soberanis's communications – and the Amended Complaint mentions his name at least 17 times – were wiped from his computer in the week to 10 days after plaintiff's promise of a discrimination lawsuit. In other words, they were gone forever.

And, as it happens, the quick action relating to plaintiff's computer didn't even matter. All that information is gone forever, as well. As already noted, we don't know exactly what steps defendant took with respect to plaintiff's computer once it was purportedly removed from the wiping process. According to Mr. Gable, there was no further mention of plaintiff's computer until after plaintiff filed suit on November 18, 2017. While plaintiff filed EEOC charges against defendant over two years before that, in October 2015, there is no indication whether anyone still had the computer or hard drive, even at that time or whether anyone even checked on it or asked about it. Mr. Gable says that once the federal lawsuit was filed, defendant's legal department finally asked him where the hard drive was, but he couldn't find it. [Dkt. #72-3]. That's not surprising given that over two years had passed. So, the claimed "hold" on plaintiff's computer – such as it was – was

completely ineffectual.

The defendant fared about as dismally in regard to any "instant messages" on employees' computers, especially those of the purported harassers. When this discovery controversy was in its early days, on July 20, 2018, defense counsel wrote to plaintiff's counsel to explain why few if any "instant messages" from defendant's employees' computers were available for discovery, informing plaintiff's counsel that "if a participant to one of these [instant] message conversations does not specifically save the message conversation as an email at the time the message conversation concludes, then that message conversation is not saved as an email, or otherwise, on the [defendant's] server." [Dkt. #56, Page 85-86/177]. Whether this was either a mistake or something more sinister, it was clearly wrong.

Actually, according to the August 15, 2018 affidavit of defendant's IT manager, Mr. Givens, "instant messages" are *automatically* stored in a "conversation history" folder in the user's email account. This is done temporarily unless the user affirmatively opts to not save the message in the email folder. [Dkt. #56, Page 89/177]. The length of this temporary retention in an email folder varies depending on the size of the file and the number of messages deposited in it, but it can be up to two years before they are automatically deleted. [Dkt. #56, Page 90/177]. Once the "instant messages" are deleted, there is no way to retrieve them. [Dkt. #56, Page 90/177].

At the time she instituted the litigation hold, Ms. Wetzel claims she thought "instant messages" were saved in a cloud-based server for 10 years in the same manner that emails were. [Dkt. # 72-1, ¶. 15; # 56, Page 90/177]. She does not say how she came to this erroneous assumption. In any event, as a result, she didn't instruct anyone in the IT department to stop the auto-delete of


completely ineffectual.

The defendant fared about as dismally in regard to any "instant messages" on employees' computers, especially those of the purported harassers. When this discovery controversy was in its early days, on July 20, 2018, defense counsel wrote to plaintiff's counsel to explain why few if any "instant messages" from defendant's employees' computers were available for discovery, informing plaintiff's counsel that "if a participant to one of these [instant] message conversations does not specifically save the message conversation as an email at the time the message conversation concludes, then that message conversation is not saved as an email, or otherwise, on the [defendant's] server." [Dkt. #56, Page 85-86/177]. Whether this was either a mistake or something more sinister, it was clearly wrong.

Actually, according to the August 15, 2018 affidavit of defendant's IT manager, Mr. Givens, "instant messages" are *automatically* stored in a "conversation history" folder in the user's email account. This is done temporarily unless the user affirmatively opts to not save the message in the email folder. [Dkt. #56, Page 89/177]. The length of this temporary retention in an email folder varies depending on the size of the file and the number of messages deposited in it, but it can be up to two years before they are automatically deleted. [Dkt. #56, Page 90/177]. Once the "instant messages" are deleted, there is no way to retrieve them. [Dkt. #56, Page 90/177].

At the time she instituted the litigation hold, Ms. Wetzel claims she thought "instant messages" were saved in a cloud-based server for 10 years in the same manner that emails were. [Dkt. # 72-1, ¶. 15; # 56, Page 90/177]. She does not say how she came to this erroneous assumption. In any event, as a result, she didn't instruct anyone in the IT department to stop the auto-delete of

any saved "instant messages." [Dkt. # 72-1, ¶. 15].[4] She says she didn't learn she was wrong until *August 2018* [Dkt. ## 72-1, Par. 15] – perhaps from the affidavit of her own IT manager Mr. Givens – but, by that time, of course, any "instant message" from the relevant time period would have been auto-deleted. As a result of defendant's claimed bungling, it managed to produce barely a handful of "instant messages" in discovery.

## II.

The failure to preserve electronic evidence is covered by Fed.R.Civ.P. 37(e). The provision was amended, effective December 1, 2015, to establish the findings needed to impose curative measures—sanctions—for the nonproduction of relevant electronic evidence. *See BankDirect Capital Fin., LLC v. Capital Premium Fin., Inc.*, 2018 WL 1616725, at *8; *A.O.A. v. Rennert*, 2018 WL 1251827, at *2 (E.D. Mo. 2018). The Rule provides:

> If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
> (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
>
> (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
>
> > (A) presume that the lost information was unfavorable to the party;
> >
> > (B) instruct the jury that it may or must presume the information was unfavorable to the party; or

---

[4] Unexplained claims of allegedly "mistaken" understanding of what the real retention schedule in a company is are apparently not uncommon in the kind of disputes presented in this case. This kind of claimed "mistake" is offered a a justification or explanation of why significant things were not saved. But, what accounts for the mistake in understanding about the affairs of one's own employer is unfortunately not explained. *See, e.g.,BankDirect Capital Fin., LLC v. Capital Premium Fin., Inc.*, 2018 WL 1616725, at *8 (N.D. Ill. 2018).

>    (C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e). "'The choice of an appropriate remedy for spoliation is confined to the sound discretion of the trial judge and is assessed on a case-by-case basis.'" *Watkins v. New York City Transit Authority.*, 2018 WL 895624, at *10 (S.D.N.Y. 2018).

Defendant does not dispute that "all instant messages sent and received by [plaintiff], VanderZanden, Sgarbossa, Soberanis, and Keiser during [plaintiff's] employment should have been preserved . . . ." [Dkt. # 72, at 11]. It also concedes that its efforts were "flawed" and "regret[able]." [Dkt. #72, at 12, 13]. So, the inquiry moves on to the Rule's two subdivisions, (e)(1) and (e)(2). Here, the defendant focuses exclusively on subdivision (e)(2), arguing that the plaintiff cannot show that defendant acted with intent to deprive plaintiff of the missing messages. [Dkt. #72, at 11-15]. For her part, plaintiff doesn't go into any depth as to whether defendant acted intentionally and, of course, as she chose not to file a reply brief, didn't bother to take up the issue when defendant challenged her on it. But, of course, subdivision (e)(1) clearly does not require any finding of intent on the defendant's part, only prejudice to the plaintiff. So it is that subdivision that we'll deal with here.

Defendant does not address the issue of prejudice either, at least not head on. It suggests that any missing messages from Mr. Soberanis wouldn't be *relevant* to plaintiff's case because she only claims he "bullied" her. Not only does that argument ignore the plain thrust and language of the Amended Complaint, which is studded with allegations of harassment and gender and racial bias, *see, e.g.,* Dkt. 19, ¶¶ 11, 15, 23, 24, 33, 36, 38, 39, 40, 42, 45, 46, 48, 49, 50, 52, 54, 58, 61, 63-65, 69, 70, 71, 75-77, 93-85, but it takes an exceedingly narrow and mistaken view of the concept of

9

"relevance" under federal law.[5]

The courts are unanimous in recognizing that the relevancy requirement is expansive and inclusive. *Sprint/United Management Co. v. Mendelsohn,* 552 U.S. 379, 387–388 (2008). The standard for admissibility has been variously described as minimal or low. *See e.g., United States v. Boros*, 668 F.3d 901, 903 (7th Cir. 2012); *United States v. Falco,* 727 F.2d 659, 664 (7th Cir. 1984); *United States v. Murzyn,* 631 F.2d 525, 529 (7th Cir. 1980). *See also United States v. Needham,* 377 Fed.Appx. 84, 85–86 (2nd Cir. 2010); *United States v. Jordan,* 485 F.3d 1214, 1218 (10th Cir. 2007); *United States v. Curtis,* 568 F.2d 643, 645 (9th Cir. 1978). The question is not whether the evidence has great probative weight, but whether it has any, and whether it in some degree advances the inquiry. *Thompson v. City of Chicago,* 472 F.3d 444, 453 (7th Cir. 2006). As Professor McCormick has aptly phrased it, to be relevant, evidence need only be a brick, not a wall. *See also Huddleston v. United States,* 485 U.S. 681, 691 (1988) ("'[I]ndividual pieces of evidence insufficient in themselves to prove a point may in cumulation prove it. The sum of an evidentiary presentation may well be greater than its constituent parts.'"). *See also* 2 *Weinstein's Federal Evidence,* § 401.04[2] [a] (Joseph M. McLaughlin ed., 2d ed.2007); *Censke v. United States,* 2014 WL 3741340, 7 (N.D.Ill.2014).

---

[5] The defendant's relevancy argument is that there is only one paragraph in the Amended Complaint which refers to text messages from Soberanis and that the only allegation in the Amended Complaint relevant to plaintiff's case is that "he bullied her." The plaintiff's reading of ¶ 38 not only takes a rigid and incorrect view of federal pleading requirements but it ignores the fact that the admitted "text messages" not only told her that she was stupid, dumb, unprofessional and brain dead, but tried to stop her from reporting racism and sexism to supervisors. He warned her that her reports were not helping her moved forward and he urged her to deny that there were problems between her and Sgarbossa and Vanderzanden and that she should not mention being discriminated against to anyone. (Amended Complaint, ¶ 38).

Thus, a generalized claim of "bullying" neither necessarily excludes nor is inconsistent with the repeated claims amplified in the Amended Complaint. Indeed, race and gender discrimination, which the Amended Complaint charges repeatedly occurred here are often manifested or accompanied by what is loosely called bullying. Or they can provide the reasons for the bullying. *See, e.g.,GP by & through JP v. Lee Cty. Sch. Bd.*, 2018 WL 2714658, at *3 (11th Cir. 2018); *Lewis v. Blue Springs School Dist.*, 2017 WL 5011893 (W.D.Mo. 2017). And bullying can lead quite easily to sexual harassment. *See, e.g., T.K. v. New York City Dep't of Educ.,* 779 F. Supp. 2d 289, 293 (E.D.N.Y. 2011). Thus, it is simply a mistake for the defendants to say that discovery directed to the charged bullying in this case is somehow not relevant under Rule 26 to claims of sexual harassment and the kind of distasteful behavior that is *alleged* to have been directed against the plaintiff.[6] *See also* ¶ 43 which charges that when plaintiff reported Kevin Keiser to Mr. Soberanis and supervisor Kristin Keglovitz, plaintiff, not Keiser, was written up, and was told to go apologize to Keiser and was told that because Keiser had been employed longer than plaintiff that no one would believe the plaintiff.

Merely calling someone "stupid, dumb, unprofessional and brain dead may not, standing alone, amount to racial or gender harassment. *See, e.g., Dandy v. United Parcel Serv., Inc.*, 388 F.3d 263, 271 (7th Cir. 2004)("lazy" and "ignorant" not attributable to race or gender); *Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 345 (7th Cir. 1999)(nothing inherently sexual or racial in comments like "dumb motherfucker"). But the defendant's strained argument, as we have said, conveniently ignores the informing context of the Amended Complaint and largely ignores the

---

[6] Nothing herein should be interpreted as even remotely suggesting that the claims in the Amended Complaint are true. We take no position on that issue, which will ultimately be decided by the jury.

modern rules regarding the reading of Complaints. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).[7]

In the end, given at least what appears to be the defendant's gross negligence – and that's viewing things favorably to the defendant – the best route is that proposed by the Advisory Committee in its notes to the 2015 amendment to Fed.R.Civ.P. 37(e)(1), specifically, allowing the parties to present evidence to the jury regarding the situation that was caused by defendant's faulty and failed litigation hold:

> In an appropriate case, it may be that serious measures are necessary to cure prejudice found by the court, such as forbidding the party that failed to preserve information from putting on certain evidence, permitting the parties to present evidence and argument to the jury regarding the loss of information, or giving the jury instructions to assist in its evaluation of such evidence or argument, other than instructions to which subdivision (e)(2) applies.
>
> \* \* \*
>
> [S]ubdivision (e)(2) would not prohibit a court from allowing the parties to present evidence to the jury concerning the loss and likely relevance of information and instructing the jury that it may consider that evidence, along with all the other evidence in the case, in making its decision. These measures, which would not involve instructing a jury it may draw an adverse inference from loss of information, would be available under subdivision (e)(1) if no greater than necessary to cure prejudice. In addition, subdivision (e)(2) does not limit the discretion of courts to give traditional missing evidence instructions based on a party's failure to present evidence it has in its possession at the time of trial.

Fed. R. Civ. P. 37(e), 2015 Amendment Advisory Committee Notes.

The trial court is generally in the best position to effect sanctions for loss or non-production of evidence as only the trial judge can see how the evidence unfolds and the import it has. Indeed,

---

[7] The Seventh Circuit has acknowledged that while a complaint must contain something more than a general recitation of the elements of the claim, it has nevertheless reaffirmed the minimal pleading standard for simple claims of race or sex discrimination. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1084 (7th Cir. 2008); *Fabian v. Hosp. of Cent. Connecticut*, 172 F. Supp. 3d 509, 527 (D. Conn. 2016). The defendant's reading of the Amended Complaint in this case is at odds with what is actually pled and the meaning that may be inferred from those allegations.

as the trial unfolds, perhaps the jury might even be allowed to assess the evidence and, properly instructed, find the defendant acted intentionally. *See, e.g., Cahill v. Dart*, 2016 WL 7034139, at *4 (N.D. Ill. 2016); *BankDirect*, 2018 WL 1616725, at *12.

It should be noted that, in a footnote in its response to plaintiff's sanctions motion, defendant objects to the use of a missing evidence instruction because, it claims, it would result "in a trial within a trial." [Dkt. #72, n. 4]. But that objection is one commonly made and often rejected, taking into account the considerations in Rule 403, Federal Rules of Evidence. *See, e.g., Diesel v. Mach, Inc.*, 418 F.3d 820, 834 (8th Cir. 2005). If taken too literally or too readily granted, the objection would exclude evidence otherwise relevant that the jury should consider in coming to a verdict. Evidence admissible under Rule 404(b), for example, comes to mind. If the defendant's "trial within a trial" argument is taken literally, it would alos and necessarily exclude the very relief allowed by Rule 37(e).

Finally, it should be noted that the defendant recently and vigorously sought additional time to take discovery to ascertain whether the plaintiff caused a Ms. Anderson to write an email of complaint to the defendant about how she claims she was treated by the defendant's HR department. [Dkt. ## 59, 71]. The defendant insisted that discovery was needed so that it could obtain evidence for trial of the plaintiff's alleged role in the whole affair,which, it contended, was a form of spoliation that would allow the jury to make negative inferences about the legitimacy of plaintiff's case. Obviously, the defendant was not troubled in the slightest by its theory of "trial within a trial," which it now seeks incorrectly to invoke against the plaintiff.

Accordingly, it is recommended that parties be allowed to present evidence and argument to the jury regarding the defendant's destruction/failure to preserve electronic evidence in this case, and

that the jury be instructed as the trial judge deems appropriate. *See, e.g., BankDirect*, 2018 WL 1616725, at *12; *Schmalz v. Vill. of N. Riverside*, 2018 WL 1704109, at *7 (N.D. Ill. 2018); *Goldrich v. City of Jersey City*, 2018 WL 4492931, at *11 (D.N.J. 2018); *Nuvasive, Inc. v. Madsen Med., Inc.*, 2016 WL 305096, at *3 (S.D. Cal. 26, 2016). Of course the evidence to be allowed and the extent of the presentation of the litigation holdare matters to be decided at trial.

## CONCLUSION

For the foregoing reasons, it is hereby recommended that the plaintiff's motion for discovery sanctions [Dkt. # 56] be granted to the extent detailed in this report and recommendation.

**ENTERED:** _____
UNITED STATES MAGISTRATE JUDGE

**DATE:** 10/4/18

**Under Fed.R.Civ.P. 72(b), parties must file in writing any objections to this Report within 14 days. Failure to file timely objections constitutes a waiver of any objections to this Report.** *See also* **28 U.S.C. §636(b)(1)(C).**